

**United States Department of Justice**

*United States Attorney*
*Southern District of West Virginia*

*Robert C. Byrd United States Courthouse*
*300 Virginia Street, East*
*Suite 4000*
*Charleston, WV 25301*
*1-800-659-8726*

*Mailing Address*
*Post Office Box 1713*
*Charleston, WV 25326*
*304-345-2200*
*304-347-5104*



FILED
OCT - 3 2019
RORY L. PERRY II, CLERK
U.S. District Court
Southern District of West Virginia

January 17, 2019

George J. Cosenza
P.O. Box 4
Parkersburg, West Virginia 26102-0004

      Re: United States v. Paul W. Burke, M.D.

Dear Mr. Cosenza:

    This will confirm our conversations with regard to your client, Paul W. Burke, M.D. (hereinafter "Dr. Burke"). As a result of these conversations, it is agreed by and between the United States and Dr. Burke as follows:

    1. **PENDING CHARGES**. Dr. Burke is charged in 6-counts of a 37-count third superseding indictment as follows:

    (a) Count One charges Dr. Burke with a violation of 21 U.S.C. § 846 (conspiracy to distribute Schedule II controlled substance);

    (b) Counts Fifteen, Twenty-One, Twenty-Six, and Thirty-Three charge Dr. Burke with violations of 21 U.S.C. § 841(a)(1) (distributing oxycodone a Schedule II controlled substance); and

    (c) Count Thirty-Seven charges Dr. Burke with a violation of 18 U.S.C. § 1956(h) (conspiracy to money launder).

    2. **CHARGING AGREEMENT**. Dr. Burke agrees to waive his right pursuant to Rule 7 of the Federal Rules of Criminal Procedure to be charged by indictment and will consent to the filing of a single-count information to be filed in the United States District Court for the Southern District of West Virginia, a copy of which

                                          *PB*
                                        Defendant's
                                        Initials

George J. Cosenza
January 17, 2019                              Re: Paul W. Burke, M.D.
Page 2

is attached hereto as "Plea Agreement Exhibit A."

    3.    **RESOLUTION OF CHARGES**. Dr. Burke will plead guilty to said single-count information, which charges him with a violation of 18 U.S.C. § 371 (conspiracy to distribute controlled substances not for legitimate medical purposes and outside the course of professional practice). Following final disposition, the United States will move to dismiss the charges in Criminal Action No. 5:18-cr-00026 as to Dr. Burke.

    4.    **MAXIMUM POTENTIAL PENALTY**. The maximum penalty to which Dr. Burke will be exposed by virtue of this guilty plea is as follows:

        a.    Imprisonment for a period of up to 5 years;

        b.    A fine of $250,000.00, or twice the gross pecuniary gain or twice the gross pecuniary loss resulting from defendant's conduct, whichever is greater;

        c.    A term of supervised release of 3 years;

        d.    A mandatory special assessment of $100.00 pursuant to 18 U.S.C. § 3013; and

        e.    An order of restitution pursuant to 18 U.S.C. §§ 3663 and 3664, or as otherwise set forth in this plea agreement.

    5.    **SPECIAL ASSESSMENT.** Prior to the entry of a plea pursuant to this plea agreement, Dr. Burke will tender a check or money order to the Clerk of the United States District Court for $100.00, which check or money order shall indicate on its face the name of defendant and the case number. The sum received by the Clerk will be applied toward the special assessment imposed by the Court at sentencing. Dr. Burke will obtain a receipt of payment from the Clerk and will tender a copy of such receipt to the United States, to be filed with the Court as an attachment to this plea agreement. If Dr. Burke fails to provide proof of payment of the special

                                                                    _PB_
                                                               Defendant's
                                                                  Initials

George J. Cosenza
January 17, 2019                      Re: Paul W. Burke, M.D.
Page 3

assessment prior to or at the plea proceeding, the United States will have the right to void this plea agreement. In the event this plea agreement becomes void after payment of the special assessment, such sum shall be promptly returned to Dr. Burke.

6.    **LICENSE REVOCATION.** Dr. Burke agrees:

a)    To surrender his Drug Enforcement Administration Certificate of Registration (DEA Form 223);

b)    Not to oppose revocation of his registration to dispense controlled substances pursuant to 21 U.S.C. § 824(a) and 21 C.F.R. § 1301.45 on the ground that he has:

     __X__    been convicted of a felony relating to a controlled substance; and

     __X__    committed such acts as would render his registration under 21 U.S.C. § 823 inconsistent with the public interest as determined under that section; and

c)    not to apply for re-registration.

7.    **FORFEITURE.** Dr. Burke hereby agrees as follows:

a.    Dr. Burke hereby acknowledges and agrees that notwithstanding the offense of conviction, he profited from the distribution of controlled substances not for legitimate medical purposes in the amount of $41,701.09 and he agrees to forfeit such amount to the United States. Dr. Burke further agrees to forfeit to the United States his medical license issued by the West Virginia Board of Medicine. Dr. Burke agrees to forfeit that sum and his medical license to the United States in a civil complaint filed by the United States and to waive service of said complaint.

*PB*
_____
Defendant's
Initials

George J. Cosenza
January 17, 2019  Re: Paul W. Burke, M.D.
Page 4

    b.   To fully complete and execute, under oath, a Financial Affidavit in a form supplied by the United States and to return to counsel for the United States the completed Affidavit within seven calendar days from the date of signing this plea agreement;

    c.   To provide sworn testimony and to execute any documents deemed necessary by the United States to effectuate the forfeiture and to transfer title to the said property to the United States; and

    d.   To waive any defenses to this criminal action, or to any related administrative or judicial forfeiture action, based in whole or in part on the Excessive Fines Clause of the Eighth Amendment to the Constitution, or the holding or principles set forth in <u>United States v. Alexander</u>, 509 U.S. 544 (1993); <u>United States v. Bajakajian</u>, 524 U.S. 321 (1998); <u>United States v. Austin</u>, 509 U.S. 602 (1993); and their progeny.

8. **PAYMENT OF MONETARY PENALTIES.** Dr. Burke authorizes the Financial Litigation Unit in the United States Attorney's Office to obtain a credit report from any major credit reporting agency prior to sentencing in order to assess his financial condition for sentencing purposes. Dr. Burke agrees not to object to the District Court ordering all monetary penalties (including the special assessment, fine, court costs, and any restitution that does not exceed the amount set forth in this plea agreement) to be due and payable in full immediately and subject to immediate enforcement by the United States. So long as the monetary penalties are ordered to be due and payable in full immediately, Dr. Burke further agrees not to object to the District Court imposing any schedule of payments as merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment.

Dr. Burke authorizes the United States, through the Financial Litigation Unit, to submit any unpaid criminal monetary penalty to

                                                                                         *PB*
                                                                                   Defendant's
                                                                                      Initials

George J. Cosenza
January 17, 2019                        Re: Paul W. Burke, M.D.
Page 5

the United States Treasury for offset in accordance with the Treasury Offset Program, regardless of the defendant's payment status or history at that time.

In addition to any payment ordered by the Court, Dr. Burke shall pay all monies received from any source other than earned income, including but not limited to, lottery winnings, gambling proceeds, judgments, inheritances, and tax refunds, toward the court ordered restitution or fine.

Dr. Burke agrees that if he retains counsel or has appointed counsel in response to the United States' efforts to collect any monetary penalty, he shall immediately notify the United States Attorney's Office, Attention: Financial Litigation Unit, P.O. Box 1713, Charleston, West Virginia 25326-1713, in writing and shall instruct his attorney to notify FLU immediately of his representation.

9. **COOPERATION.** Dr. Burke will be forthright and truthful with this office and other law enforcement agencies with regard to all inquiries made pursuant to this agreement, and will give signed, sworn statements and grand jury and trial testimony upon request of the United States. In complying with this provision, Dr. Burke may have counsel present except when appearing before a grand jury. Further, Dr. Burke agrees to be named as an unindicted co-conspirator and unindicted aider and abettor, as appropriate, in subsequent indictments or informations.

10. **USE IMMUNITY.** Unless this agreement becomes void due to a violation of any of its terms by Dr. Burke, and except as expressly provided for in paragraph 12 below, nothing contained in any statement or testimony provided by him pursuant to this agreement, or any evidence developed therefrom, will be used against him, directly or indirectly, in any further criminal prosecutions or in determining the applicable guideline range under the Federal Sentencing Guidelines.

_PB_
Defendant's
Initials

George J. Cosenza
January 17, 2019                          Re: Paul W. Burke, M.D.
Page 6

    11. **LIMITATIONS ON IMMUNITY.** Nothing contained in this agreement restricts the use of information obtained by the United States from an independent, legitimate source, separate and apart from any information and testimony provided pursuant to this agreement, in determining the applicable guideline range or in prosecuting Dr. Burke for any violations of federal or state laws. The United States reserves the right to prosecute Dr. Burke for perjury or false statement if such a situation should occur pursuant to this agreement.

    12. **STIPULATION OF FACTS AND WAIVER OF FED. R. EVID. 410.** The United States and Dr. Burke stipulate and agree that the facts comprising the offense of conviction include the facts outlined in the "Stipulation of Facts," a copy of which is attached hereto as "Plea Agreement Exhibit B."

    Dr. Burke agrees that if he withdraws from this agreement, or this agreement is voided as a result of a breach of its terms by him, and he is subsequently tried for his conduct alleged in the second superseding indictment and other relevant conduct, as more specifically described in the Stipulation of Facts, the United States may use and introduce the Stipulation of Facts in the United States case-in-chief, in cross-examination of Dr. Burke or of any of his witnesses, or in rebuttal of any testimony introduced by him or on his behalf. Dr. Burke knowingly and voluntarily waives, see <u>United States v. Mezzanatto</u>, 513 U.S. 196 (1995), any right he has pursuant to Fed. R. Evid. 410 that would prohibit such use of the Stipulation of Facts. If the Court does not accept the plea agreement through no fault of the defendant, or the Court declares the agreement void due to a breach of its terms by the United States, the Stipulation of Facts cannot be used by the United States.

    The United States and Dr. Burke understand and acknowledge that the Court is not bound by the Stipulation of Facts and that if some or all of the Stipulation of Facts is not accepted by the Court, the parties will not have the right to withdraw from the plea agreement.

                                                                  *PB*
                                                                     Defendant's
                                                                       Initials

George J. Cosenza
January 17, 2019
Page 7

Re: Paul W. Burke, M.D.

13.  **WAIVER OF APPEAL AND COLLATERAL ATTACK.** Dr. Burke knowingly and voluntarily waives his right to seek appellate review of his conviction and of any sentence of imprisonment, fine, or term of supervised release imposed by the District Court, or the manner in which the sentence was determined, on any ground whatsoever including any ground set forth in 18 U.S.C. § 3742(a), except that the defendant may appeal any sentence that exceeds the maximum penalty prescribed by statute. Dr. Burke also knowingly and voluntarily waives any right to seek appellate review of any claim or argument that (1) the statute of conviction 18 U.S.C. § 371 is unconstitutional, and (2) Dr. Burke conduct set forth in the Stipulation of Facts (Plea Agreement Exhibit B) does not fall within the scope of 18 U.S.C. § 371.

The United States also agrees to waive its right to appeal any sentence of imprisonment, fine, or term of supervised release imposed by the District Court, or the manner in which the sentence was determined, on any ground whatsoever, including any ground set forth in 18 U.S.C. § 3742(b), except that the United States may appeal any sentence that is below the minimum penalty, if any, prescribed by statute.

Dr. Burke also knowingly and voluntarily waives the right to challenge his guilty plea and conviction resulting from this plea agreement, and any sentence imposed for the conviction, in any collateral attack, including but not limited to a motion brought under 28 U.S.C. § 2255.

The waivers noted above shall not apply to a post-conviction collateral attack or direct appeal based on a claim of ineffective assistance of counsel.

14.  **WAIVER OF FOIA AND PRIVACY RIGHT.** Dr. Burke knowingly and voluntarily waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without any

_PB_
Defendant's Initials

George J. Cosenza  
January 17, 2019                            Re: Paul W. Burke, M.D.  
Page 8

limitation any records that may be sought under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a, following final disposition.

    15. **FINAL DISPOSITION.** The matter of sentencing is within the sole discretion of the Court. The United States has made no representations or promises as to a specific sentence. The United States reserves the right to:

        a. Inform the Probation Office and the Court of all relevant facts and conduct;

        b. Present evidence and argument relevant to the factors enumerated in 18 U.S.C. § 3553(a);

        c. Respond to questions raised by the Court;

        d. Correct inaccuracies or inadequacies in the presentence report;

        e. Respond to statements made to the Court by or on behalf of Dr. Burke;

        f. Advise the Court concerning the nature and extent of Dr. Burke's cooperation; and

        g. Address the Court regarding the issue of Dr. Burke's acceptance of responsibility.

    16. **VOIDING OF AGREEMENT.** If either the United States or Dr. Burke violates the terms of this agreement, the other party will have the right to void this agreement. If the Court refuses to accept this agreement, it shall be void.

    17. **ENTIRETY OF AGREEMENT.** This written agreement constitutes the entire agreement between the United States and Dr. Burke in this matter. There are no agreements, understandings or recommendations as to any other pending or future charges against Dr. Burke in any Court other than the United States District Court

*PB*  
_____  
Defendant's Initials

George J. Cosenza
January 17, 2019                      Re: Paul W. Burke, M.D.
Page 9

for the Southern District of West Virginia.

    Acknowledged and agreed to on behalf of the United States:

                       MICHAEL B. STUART
                       United States Attorney

             By: *[signature: Monica D. Coleman]*
                       MONICA D. COLEMAN
                       Assistant United States Attorney

MDC/smw

*[Defendant's initials: PB]*

                                                        Defendant's
                                                         Initials

George J. Cosenza
January 17, 2019                             Re: Paul W. Burke, M.D.
Page 10

    I hereby acknowledge by my initials at the bottom of each of the foregoing pages and by my signature on the last page of this ten-page agreement that I have read and carefully discussed every part of it with my attorney, that I understand the terms of this agreement, and that I voluntarily agree to those terms and conditions set forth in the agreement. I further acknowledge that my attorney has advised me of my rights, possible defenses, the Sentencing Guideline provisions, and the consequences of entering into this agreement, that no promises or inducements have been made to me other than those in this agreement, and that no one has threatened me or forced me in any way to enter into this agreement. Finally, I am satisfied with the representation of my attorney in this matter.

_/s/ Paul W. Burke, MD_____        _Feb. 16, 2019_____
Paul W. Burke, M.D.                         Date Signed
Defendant

_/s/ George J. Cosenza_____       _2/16/19_____
George J. Cosenza                           Date Signed
Counsel for Defendant

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON

**UNITED STATES OF AMERICA**

v.                                CRIMINAL NO._____
                                  18 U.S.C. § 371
**PAUL W. BURKE, M.D.**

I N F O R M A T I O N
(Conspiracy to Distribute Controlled Substances Not for a
Legitimate Medical Purpose and Beyond the Bounds of Medical
Practice)

The United States Attorney Charges:

1. From in or about April 2014, through in or about September 2014, at or near Charleston, Kanawha County, West Virginia, within the Southern District of West Virginia, defendant PAUL W. BURKE, M.D., did knowingly conspire and agree with two or more persons known and unknown to the United States Attorney, to commit an offense against the United States, that is to distribute Schedule II controlled substances, including a mixture and substance containing oxycodone, not for a legitimate medical purpose in the usual course of professional practice and beyond the bounds of medical practice, in violation of 21 U.S.C. § 841(a)(1).

2. In furtherance of the conspiracy and to effect its objective, defendant PAUL W. BURKE, JR., committed the following and other overt acts:

PLEA AGREEMENT EXHIBIT "A"

a. On July 2, 2014, while working at the HOPE Clinic in Charleston, Kanawha County, West Virginia, defendant BURKE wrote HOPE Clinic customer N.J. a prescription for 90 oxycodone 30 mg pills not for a legitimate medical purpose in the usual course of professional practice and beyond the bounds of medical practice. Defendant Burke had never examined customer N.J. or even met customer N.J. before issuing the prescription on July 2, 2014. Defendant BURKE did not review customer N.J.'s entire medical chart before prescribing oxycodone to her in order to determine whether treating her with opioids was medically necessary or appropriate. Defendant BURKE did not discuss with customer N.J. at any time her prior failed drug screens, including a prior failure for illicit cocaine. Defendant BURKE did not warn customer N.J. about the danger of taking drugs not as prescribed, and did not discuss with customer N.J. the possibility of addiction or chemical dependency. Defendant BURKE did not discuss any future treatment plan with customer N.J., and did not discuss or review any medical treatment other than writing a prescription for highly addictive opioid medication. Defendant BURKE did not observe any such documentation in customer N.J.'s chart by any physician at HOPE Clinic.

b. On August 25, 2014, defendant BURKE wrote prescriptions to customer S.W. for 150 oxycodone 15 mg and 60 Percocet 10 mg not for a legitimate medical purpose in the usual course of professional practice and beyond the bounds of medical practice.

PLEA AGREEMENT EXHIBIT "A"

Customer S.W.'s first visit to the HOPE Clinic was on December 18, 2012. She had an MRI report with essentially normal findings and no other prior medical records in her chart. Between December 2012 and August 2014, seven different doctors, including defendant BURKE, at the HOPE Clinic, wrote customer S.W. a total of 720 oxycodone 10 mg pills and 2,550 oxycodone 15 mg pills not for a legitimate medical purpose in the usual course of professional practice and beyond the bounds of medical practice. Customer S.W. took seven drug tests during this time and failed every single one and no physician, including defendant BURKE, discussed with customer S.W. drug addiction, drug abuse, drug treatment, or drug diversion.

In violation of Title 18, United States Code, Section 371.

MICHAEL B. STUART
United States Attorney

By: _____
MONICA D. COLEMAN
Assistant United States Attorney

PLEA AGREEMENT EXHIBIT "A"

L

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
BECKLEY

UNITED STATES OF AMERICA

v.                                    CRIMINAL NO. _____

PAUL W. BURKE, M.D.

## STIPULATION OF FACTS

The United States and Paul W. Burke, M.D. (hereinafter "defendant" or "I") stipulate and agree that the facts comprising the offense of conviction in the single-count Information include the following:

At all relevant times, defendant was licensed by the State of West Virginia to practice medicine through the West Virginia Board of Medicine and maintained a DEA registration number.

### Overview

The Charleston HOPE Clinic was located at 4407 MacCorkle Avenue, Charleston, Kanawha County, West Virginia. Paul W. Burke, M.D., worked at the Charleston HOPE Clinic from April 2014 through September 2014. As detailed below, many of the prescriptions defendant Burke and his co-defendant practitioners wrote for HOPE Clinic customers were illegal, as they were not for a legitimate medical purpose in the usual course of professional medical practice and were beyond the bounds of medical practice. Even if Burke subjectively believed that the customers for whom he wrote prescriptions were suffering from chronic pain and the prescriptions he wrote for those patients were meant to address that pain, many of those prescriptions that both he and the other HOPE Clinic doctors wrote were illegal because objectively, they were not for legitimate medical reasons in the usual course of professional medical practice and were beyond the bounds of medical practice because, among other reasons, the charts did not contain appropriate medical records justifying the treatment with opioids, the doctors did not discuss other treatments for pain besides opioids, and the doctors ignored or overlooked clear signs of abuse, addiction, and diversion, all of which fell so far below

the standard of medical practice generally recognized and accepted in the professional medical community as to make the prescriptions illegal.

The HOPE Clinic received payments from these customers, and defendant Burke received bonuses for his work at the HOPE Clinic from funds resulting from the customer payments, based upon the monthly profit from the number of customers who visited and paid each month. These bonuses promoted the conspiracy to distribute controlled substances not for legitimate medical purposes in the usual course of professional medical practice and beyond the bounds of medical practice.

Distribution of Controlled Substances Not
For Legitimate Medical Purposes in the
Usual Course of Professional Medical Practice and
<u>Beyond the Bounds of Medical Practice</u>

James Blume, D.O., owned the HOPE Clinic and contracted Mark Radcliffe as the practice manager to run the daily operations of the HOPE Clinic. Mark Radcliffe owned and operated PPPFD, which purportedly functioned to allow doctors to safely and legally prescribe opioids, such as oxycodone, to customers and to allow pharmacies to safely dispense those opioids by weeding out alleged "diverters" of opioid prescriptions who, among other things:

- sought prescriptions from multiple doctors,
- abused opioids and other drugs, and
- illegally sold their opioid prescriptions to other individuals.

While James Blume was a licensed medical doctor, Mark Radcliffe was not a licensed medical professional. James Blume recruited Burke to work at the HOPE Clinic despite Burke being primarily an emergency room doctor and surgeon with little experience in dealing with chronic pain patients and no training in prescribing schedule II narcotics for the treatment of chronic pain. Blume explained to Burke that narcotics auditors employed by PPPFD, who were "former DEA Agents," would screen customers for abuse, addiction, and diversion prior to the customer ever seeing him.

In approximately April 2014, Burke began working at the Charleston HOPE Clinic. Burke understood at the time he was contracted that the purpose of HOPE Clinic was to provide pain customers with oral opiate pain medicine. As Mark Radcliffe and

James Blume knew, however, Burke had no background or specialized training in chronic pain management.

Throughout his work at HOPE Clinic, Burke understood through his interactions, conversations, and correspondence with James Blume, PPPFD employees, and other doctors at HOPE Clinic, that the main purpose of HOPE Clinic was to provide opioid prescriptions on a monthly basis to customers visiting HOPE Clinic.

At Mark Radcliffe's direction, PPPFD employees interviewed each customer on a monthly basis and took their vital signs. Sometimes PPPFD employees performed drug screens to ascertain (1) whether customers were taking their medications as prescribed, or (2) whether customers were using other controlled substances without a prescription or (3) whether customers were using illicit controlled substances. However, customers' drug screen failures seldom affected whether Burke and other HOPE Clinic doctors continued to prescribe Schedule II narcotics.

Burke was one of four primary physician at the Charleston location of the HOPE Clinic from April 2014 through September 2014. At a customer's initial visit, Burke or one of his co-defendant practitioners met with the customer. A customer usually received a monthly prescription for opioids at his or her initial visit, frequently without regard to whether the customer's conditions or initial examination medically justified the prescription of Schedule II narcotics.

For a customer to receive additional prescriptions, Mark Radcliffe and PPPFD required the customer to return to HOPE Clinic every 28 days and pay a fee. Pursuant to guidelines established by Mark Radcliffe, customers typically only met with non-medical PPPFD staff on the customers' second and third visits to HOPE Clinic to receive opioid prescriptions. Generally, Burke only encountered HOPE Clinic customers once every three visits to the clinic. During customers' return visits, Burke typically either performed cursory examinations or performed no examinations. As he and the other doctors at HOPE Clinic knew, Burke and the other doctors at HOPE Clinic did not create any meaningful treatment plans for customers. Generally, there was no documentation in customer charts that Burke discussed or reviewed prior treatments with customers; discussed or reviewed alternative treatments with customers such as physical therapy, chiropractor, or trigger point injections; discussed the benefits and risks of opioids; or discussed long-term goals with customers other than prescribing opioids.

While Dr. Burke worked for the HOPE Clinic, he was a temporary employee hired by an outside company that supplied doctors to the HOPE Clinic on a contract basis. Burke was paid an hourly rate by the outside company. In addition to his hourly pay, Burke received bonuses, paid by James Blume, based on the number of paying customers at the HOPE Clinic. Some months, Burke's bonus exceeded his hourly pay.

Whether Burke examined the customers or whether customers only met with non-medical PPPFD employees, Burke signed customers' opioid prescriptions for Schedule II narcotics. The prescriptions commonly were for oxycodone and oxycodone-based narcotics such as Percocet, Roxicodone, and Endocet. Burke wrote these prescriptions at times even after customers' drug screened positive for other controlled substances the customers were not prescribed, or even after customers' drug screened negative for prescribed medications by the HOPE Clinic.

### Defendant's Factual Basis for Offense of Conviction

Before I started working at the Charleston HOPE Clinic, I was skeptical of working in a pain clinic.[1] After talking with Drs. Blume and Gullett, I was more comfortable that the Clinic was properly treating patients. When I started working at the HOPE Clinic, it became apparent that some of the customers were not getting properly evaluated prior to the doctors writing them prescriptions for opioids. The customers' files were poorly kept and had little relevant medical information in them. Many of the patients came to the HOPE Clinic from out of state, and most customers paid in cash. I often received a bonus on top of my hourly pay that was clearly based on the number of paying customers at the Clinic. Despite all of these red flags, I continued to work at the HOPE Clinic and I continued to write customers prescriptions for Schedule II narcotics.

For example, patient N.J. lived in the state of Ohio and traveled to Charleston, West Virginia to get opioid prescriptions from doctors at the HOPE Clinic. N.J. was addicted to opioid medication and was also selling opioid pain medication for money. N.J. heard that she could travel to the HOPE Clinic in Charleston, West Virginia and receive prescription medication with little to no medical documentation. After receiving her prescription from HOPE Clinic, N.J. would distribute her pills in Ohio for profit.

---

[1] Because I only worked at the Charleston HOPE Clinic, I do not have personal knowledge of how the Beckley and Wytheville HOPE Clinics operated.

N.J. travelled to the HOPE Clinic with a group of individuals from Ohio who were also selling their prescriptions.

N.J.'s first visit to the HOPE Clinic was on September 25, 2012, and she was seen by Dr. Stanley who prescribed her oxycodone at a total of 40 milligrams per day. There were minimal medical records in N.J.'s chart and meager medical documentation to support a prescription for opioid medication. Other than N.J.'s self-reported pain level, the chart does not document any reason or rationale to immediately start N.J. on that dosage of oxycodone. Further, the chart does not contain any mention of alternative treatment options such as physical therapy or lifestyle modification.

On January 15, 2013, N.J. had a positive drug test for nonprescribed Tramadol, but on her next visit, February 12, 2013, Dr. Stanley continued to prescribe her oxycodone and he did not even note in her chart that they discussed (or that he even saw) the failed drug screen. On April 9, 2014, N.J. had a positive drug test for cocaine metabolite, but on her next visit, May 7, 2014, Dr. Earley prescribed her oxycodone and he did not even note in her chart that they discussed (or that he even saw) her failed drug screen.

On July 2, 2014, N.J. traveled from Ohio to the HOPE Clinic in Charleston, West Virginia, in order to obtain a prescription for oxycodone. On that day, I did not see N.J., thus, I did not do a physical examination of N.J. Further, I only reviewed a small portion of her chart to determine whether treating her with opioids was medically necessary or appropriate. I did not discuss with her the prior failed drug screens, nor did I warn her about the danger of taking drugs not as prescribed, taking drugs not prescribed, or taking illegal drugs such as cocaine. I did not discuss with her the possibility of addiction or chemical dependency. I did not discuss a future treatment plan or attempt in any way to recommend or discuss any medical treatments other than simply writing her a prescription for opioids. In fact, no such discussions were ever documented in her chart. I prescribed N.J. 90 oxycodone 30 mg pills.

Looking objectively at N.J.'s chart, the prescriptions written by myself, Dr. Stanley, Dr. Earley, and Dr. Gullett were beyond the bounds of medical practice.

S.W. was another customer of the HOPE Clinic who doctors should not have prescribed Schedule II opioid medications. Doctors at the HOPE Clinic, myself included, prescribed oxycodone to S.W.,

and those prescriptions were not for a legitimate medical reason in the usual course of professional practice and were beyond the bounds of medical practice. S.W.'s first visit with a doctor at the HOPE Clinic was on December 18, 2012. She had an MRI report which showed mild degree of posterior disc bulging at L5-S1 but was otherwise normal. There are no other medical records in the entire chart. Between December 2012 and September 2014, eight different doctors at the HOPE Clinic wrote her prescriptions for a total of 720 oxycodone 10 mg pills and 2,670 oxycodone 15 mg pills. During that less than two year period, she took eight drug tests and failed every single one. Because of inadequate training, inexperience, and reliance on PPPFD, I only recognized that she failed three drug tests. Prior to her being discharged by Dr. Chad Turner, no one at the HOPE Clinic discussed drug addiction, drug abuse, drug treatment or drug diversion with S.W. On August 25, 2014, despite the clear evidence of abuse and diversion, I wrote S.W. a prescription for 150 oxycodone 15 mg and 60 Percocet 10 mg. An objective review of S.W.'s chart indicates that these prescriptions were beyond the bounds of medical practice.

Oxycodone is a Schedule II controlled substance.

Charleston, Kanawha County, West Virginia, is within the Southern District of West Virginia.

This Stipulation of Facts does not contain each and every fact known to defendant and to the United States concerning his involvement and the involvement of others in the charge set forth in the Information or in the charges set forth in the Third Superseding Indictment in Criminal No. 5:18-cr-00026.

Stipulated and agreed to:

_____   March 4, 2019
PAUL W. BURKE, M.D.                Date
Defendant

_____   3/4/19.
GEORGE J. COSENZA                  Date
Counsel for Defendant

_____   10/3/2019
MONICA D. COLEMAN                  Date
Assistant United States Attorney

6